UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SALLY D. VILLAVERDE,<br><br>Petitioner,<br><br>v.<br><br>GREG SMITH, et al.,<br><br>Respondents. | Case No. 3:10-cv-00347-MMD-WGC<br><br>ORDER |

This petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 by state prisoner Sally D. Villaverde is before the Court for final disposition on the merits of his counseled, first-amended petition (dkt. no. 29). Respondents have answered the remaining grounds (dkt. no. 65), and Villaverde replied (dkt. no. 67).

**I.    PROCEDURAL HISTORY AND BACKGROUND**

On April 8, 2004, a jury convicted Villaverde of count I — burglary; count II — first-degree murder with use of a deadly weapon; and count III — robbery with use of a deadly weapon. (Exh. 78.)[1] The state district court sentenced him as follows:  count I — 22 to 96 months; count II — life without the possibility of parole, plus an equal and consecutive term for the deadly weapon; count III — 35 to 156 months, plus an equal and consecutive term for the use of a deadly weapon, all sentences to run consecutively. (Exh. 81.) The Nevada Supreme Court affirmed his convictions on February 15, 2006. (Exh. 87.) The Nevada Supreme Court affirmed the denial of Villaverde's state postconviction petition on May 10, 2010. (Exh. 135.)

---

[1]Respondents filed the exhibits referenced in this Order, and they are located at dkt. nos. 23, 24, 66.

Villaverde's federal petition for writ of habeas corpus is now before the Court for disposition on the merits of the remaining grounds, ground 1 and 2.

## II. ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA)

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state

2

court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the

///

3

burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### III.   INSTANT PETITION

#### A.   Ground 1

##### 1.   Sixth Amendment Confrontation Clause

"In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." U.S. Const. Amend. VI. Villaverde asserts that the trial court erred in admitting Teresa Gamboa's sworn preliminary hearing testimony at trial as the previous testimony of an unavailable witness in violation of his Sixth Amendment confrontation rights and Fourteenth Amendment due process rights (dkt. no. 29 at 7-21).

"[A] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (abrogated on other grounds in *Crawford v. Washington*, 541 U.S. 36 (2004) (quoting *Barber v. Page*, 390 U.S. 719, 724-725 (1968). Whether the prosecution has made good-faith efforts is a question of reasonableness. *Roberts*, 448 U.S. at 74.

##### 2.   Preliminary Hearing Testimony

On March 21, 2003, Teresa Gamboa testified at Villaverde's preliminary hearing. (Exh. 3, pt. A.) She testified as follows: Villaverde (whom she identified in court) had been her boyfriend; they started dating in May 2001. (*Id*. at 84.) She also identified Villaverde's co-defendants, Rene Gato and Roberto Castro, and stated that Gato's car at the time was a four door white sedan. (*Id*. at 86.)

On March 5, 2002, Villaverde asked Gamboa to rent a motel room for Villaverde and Gato because they had "business" to conduct. (*Id*. at 88.) Gamboa and Villaverde expected to receive "a lot" of money as well as drugs for renting the room. (*Id*. at 89-90.)

Gamboa speaks some Spanish. When she and the defendants were driving to the motel, Castro asked Villaverde in Spanish if Gamboa knew everything that was going on, and Villaverde responded, "Yes, but not everything." (*Id*. at 93.) The

4

defendants and Gamboa drove to a motel that, due to construction, was only renting rooms in the back. The co-defendants sent Gamboa in with a one-hundred dollar bill and told her to get a room in the back of the hotel that would be "hidden" or "concealed," which she did. She used a friend's identification to rent the room. (*Id.* at 94.)

After the room was rented, everyone drove back to Gamboa's home, and Villaverde unlocked the garage where Gato had previously left a handgun. (*Id.* at 98.) Villaverde then joined Gamboa in the house and switched cell phones with Gamboa, took a taser gun she had, and then left with the co-defendants. (*Id.* at 98.)

About five hours later, Villaverde returned to Gamboa's home. (*Id.* at 100.) He was "freaked out," crying, saying "he's dead," and he had blood on his clothes. (Exh. 3, pt. B at 101-102.) Villaverde explained in detail how he helped murder the victim along with his co-defendants. He stated that "they" dragged a guy into the hotel room, that the victim appeared to know what was going on and started "crying like a baby." Villaverde attempted to restrain the victim with duct tape. The victim got his arm loose, and then Gato shot him. (*Id.* at 103.)

Villaverde told Gamboa that he and the co-defendants attempted to clean the room and wipe off fingerprints. They wiped off everything in the room, and then they drove to a dumpster where they discarded the victim's personal belongings. Villaverde later disposed of his own bloody clothes in a dumpster behind Gamboa's home. (*Id.* at 104-105.)

Villaverde had about $400 and two or three gold bracelets that belonged to the victim. Gamboa was with him when he pawned them about five days later. (*Id.* at 106-107.) Gato and Castro told Villaverde over the phone that they were on their way out of the country. Gamboa and Villaverde drove to California to meet with them first on March 6, 2002. At a hotel in California, Gamboa asked who killed the victim and the co-defendants collectively said "we did." They stated that the victim was strangled with a belt, tased, and Gato shot him with a handgun. (*Id.* at 110-112.)

///

A police detective questioned Gamboa; Gamboa stated they had a few conversations but she did not give him truthful or complete information until after Villaverde was arrested. (*Id.* at 114-115.) Counsel for Villaverde as well as counsel for each co-defendant cross examined Gamboa. (*Id.* at 115-168.)

### 3.     State's Motion to Admit Preliminary Hearing Testimony

On March 5, 2004, the State moved to admit Gamboa's preliminary hearing testimony at trial. In Nevada, a witness's preliminary hearing transcript testimony may be received in evidence at trial if (1) defendant was represented by counsel at the preliminary hearing; (2) defendant's counsel cross examined the witness at the preliminary hearing; and (3) the witness is shown to be actually unavailable at the time of trial. NRS § 171.198 (6)(b); *Funches v. State*, 944 P.2d 775, 777-778 )(Nev. 1997); *Drummond v. State*, 462 P.2d 1012, 1014 (Nev. 1970). To ascertain "unavailability" for confrontation clause purposes, the inquiry is whether the witness is unavailable despite the prosecution's good-faith efforts to locate the witness prior to trial and to present that witness. *See Ohio v. Roberts*, 448 U.S. 56, 74 (1980). "What constitutes a good-faith effort is a question of reasonableness." *Quillen v. State*, 929 P.2d 893, 896 (Nev. 1996).

The State indicated in its motion that it was no longer able to locate Gamboa. As to the three-part test set forth above, the State pointed out in its motion that Villaverde was represented by counsel at the preliminary hearing and his counsel cross examined Gamboa, satisfying the first two prongs of the test.

With respect to the third prong, the State argued that its investigator undertook the following reasonable efforts to locate Gamboa. With respect to the previous trial setting in this case, investigator Phil Stahl contacted Gamboa at her new address where she was living with her mother. (Exh. 49 at 63-64.) The State met with Gamboa and she appeared willing to cooperate and testify at trial. When the trial was postponed, a new subpoena was mailed to her at that address. Stahl then learned from the apartment complex manager that Gamboa and her mother had moved. He had no forwarding address. Stahl checked Gamboa's criminal history, which revealed that she was on

probation in a Nevada case. He contacted her case worker who said that Gamboa had been arrested in December 2003 "but for some reason was released by someone from our office."[2] A bench warrant issued for Gamboa's arrest on January 28, 2004. Gamboa's probation officer had no additional information as to where to locate Gamboa. Gamboa had quit her last known employment. That company gave Stahl information about another employee who was a friend of Gamboa's, which has not led to Gamboa's discovery. Stahl checked assessor's files, utilities, welfare investigations, and Department of Motor Vehicles records for Gamboa, and he checked with her mother. The State thus asked that if it was still unable to locate Gamboa by the beginning of trial, the court admit her preliminary hearing testimony. *Id.*

Villaverde did not file an opposition to the State's motion. On March 8, 2004, the State obtained a material witness warrant for Gamboa's arrest. (Exh. 52 (dkt. no. 23-10, at 11-13).) At a March 12, 2004, hearing on the motion, Villaverde's counsel asked the court to order the State to continue trying to locate Gamboa. (Exh. 43 (dkt. no. 23-9 at 24-35) at 33.) The court noted that the State has a duty to continue looking for Gamboa. (*Id.* at 34.)

Trial commenced March 29, 2004. (Exh. 62.) On April 2, 2004, Villaverde filed a motion to reconsider the admission of Gamboa's testimony at trial. (Exh. 75 (dkt. no. 24-13 at 12-16).) Specifically, Villaverde argued that it should be excluded in its entirety, or alternatively, Gamboa's published testimony should be limited to the direct exam by the State and the cross examination by Villaverde's counsel. Villaverde argued that testimony regarding the "possibility of a robbery" should be excluded because if Gamboa formed this speculative opinion based on statements by co-defendants, the admission of her testimony would violate *Bruton v. United States*, 391 U.S. 123 (1990).[3]

---

[2] While not entirely clear, it appears that what Stahl meant by this phrase is that someone from the district attorney's office released Gamboa from custody.

[3] The Court in *Bruton* held that out of court statements made by a co-defendant cannot be used against another co-defendant without the opportunity to confront and cross examine the declarant. *Bruton*, 391 U.S. at 126.

7

(*Id.*) (*See also* Exh. 66 (dkt. no. 23-16 at. 24-57) at 27.) Later that same day, April 2, the court denied the motion to reconsider. (Exh. 69, pt. A at 62; Exh. 69, pt. B at 2-4.) The court found that Gamboa had been extensively cross examined by counsel for Villaverde and the two co-defendants. (*Id.*) The State explained that it had continued to look for Gamboa, including surrounding her parents' home on a tip that she might be there. She was not, and her parents gave what turned out to be false information as to where Gamboa could be found. (*Id.*) Villaverde's counsel also acknowledged that he had utilized his court-appointed investigator to try to locate Gamboa, to no avail. (*Id.*)

### 4. Jury Trial

The trial testimony reflects the following: Rogelia Lopez testified that she was the manager of the motel where the murder occurred. (Exh. 67, pt. A at 5.) On the day in question, a white, four-door sedan pulled up with several male occupants and one female. She identified Villaverde as one of the people in the car. The female rented a room at the back end of the motel. All four exited the vehicle and went into motel room number 10 without any luggage. Ten or fifteen minutes later they re-emerged and drove away. (*Id.* at 6-19.)

About five hours later, Lopez saw Villaverde heading in the direction of the rented room on foot. Lopez's mother asked Villaverde if he had a room, and Lopez heard Villaverde say he was headed to room 10. Lopez testified that the white car was parked near room 10, along with other cars including a Lexus SUV. (*Id.* at 27-30.)

In the morning, Lopez went to room 10 to clean it, and the door was partially open. Lopez entered the room and found the victim's body. She immediately called the police. (*Id.* at 33-34.) Later, she observed that there were no motel towels in the room and no wastebasket liner in the wastebasket. (*Id.* at 43-45.)

Las Vegas Metropolitan Police Officer James Carroll testified that he was one of the first officers to the crime scene. He found a dead body, a broken electrical face plate from the wall, a shell casing, and blood smeared throughout the bathroom "as if somebody tried to clean up a large amount of blood." (*Id.* at 80-82.)

8

Crime scene analyst Joseph Matvay testified that there were no towels in the bathroom and no toilet paper. (Exh. 67, pt. B at 146.) He observed blood droplets in the bathroom and on a space heater in the room. (*Id.* at 154, 169.)

Police located and impounded the Lexus SUV that Gamboa described at the preliminary hearing; tests revealed bloodstains in the interior. (Exh. 68, pt. B at 77-78.) Records admitted at trial reflected that Gato and Villaverde each rented a room at a Motel 6 in California on March 6-7, 2002. (Exh. 69, pt. A at 4-6.)

Leonel Garcia testified that he was a friend of the victim and that the victim was a successful cocaine dealer. (*Id.* at 13-14.) Garcia testified that Gato and Castro had approached him on prior occasions about luring the victim somewhere in order to rob him. That plan also included killing the victim, who "of course" could not be allowed to live after being kidnapped and robbed. Garcia refused and warned the victim that he was in danger. When Garcia learned the victim had in fact been murdered, he immediately contacted police and provided them with the information concerning the other co-defendants' plans. Garcia testified that the victim owned a Lexus SUV. (*Id.* at 17-31.)

Following this testimony, Gamboa's preliminary hearing testimony was read to the jury. (Exh. 69, pt B at 70-143.) A fingerprint expert also testified that Gato and Villaverde's fingerprints were found at the crime scene. (Exh. 70, pt. A at 23.) The victim's mother identified items of jewelry that her son always wore. (Exh. 69, pt. B at 148.) The pawn shop manager identified Villaverde as the person who had pawned the jewelry that the victim's mother had identified as belonging to the victim. (Exh. 70, pt. B at 83-85.) The medical examiner testified that the primary cause of death was strangulation, with contribution from various head wounds. (*Id.* at 124-126.)

### 5. Federal Ground 1

Villaverde asserts that the trial court erred in admitting Teresa Gamboa's sworn preliminary hearing testimony at trial as the previous testimony of an unavailable

///

9

witness in violation of his Sixth Amendment confrontation rights and Fourteenth Amendment due process rights (dkt. no. 29 at 7-21).

In affirming Villaverde's convictions, the Nevada Supreme Court agreed with the trial court that the State did nothing wrong when it released Gamboa from unrelated custody and exercised reasonable diligence in trying to locate her prior to trial. (Exh. 87 (dkt. no. 24-15, pp. 32-38) at 34.) The Nevada Supreme Court further reasoned:

> [A]dmission of Gamboa's testimony did not implicate Villaverde's Sixth Amendment rights. The admission of out-of-court statements only violates a defendant's Sixth Amendment rights if the statements are admitted without the ability to cross-examine the declarant and the statements are "testimonial" in nature. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The confrontation element is satisfied because Villaverde had the ability to cross-examine Gamboa at the preliminary hearing and, in fact, did so.

*Id.* at 34.

Considering a State's good-faith and reasonable efforts to secure the presence of a witness at trial, in *Motes v. U.S.*, 178 U.S. 458 (1900), a co-defendant who was an escape risk was apparently released from state custody despite supposedly being held without bail, given over to the care of another witness by law enforcement officials with instructions to allow the witness to spend the night with his family before his appearance in court the following day, and then could not be found at the time of trial despite apparently having been seen immediately beforehand at the courthouse.The United States Supreme Court concluded that the State did not act in good faith, and therefore, that witness could not be deemed unavailable so as to make prior testimony admissible at trial. *Id.*

In *Barber v. Page*, 390 U.S. 719, 723 (1968), the Supreme Court held that a witness had not been unavailable for confrontation clause purposes because the State had made absolutely no effort to obtain his presence at trial apart from determining that he was serving a sentence in a federal prison..

In *Hardy v. Cross*, 132 S.Ct. 490, 492 (2011), the State represented that it had been in constant contact with the witness and her mother and that every indication was that the witness, though very frightened, would testify. Shortly before trial, the witness

could not be located. The State explained that its efforts included: constant visits at varying times of day and night to the witness's mother's house where the witness had lived up until she ran away and disappeared; visits to the witness's father's home; personal and telephone conversations with witness's parents and other family members; checks at local hospitals, department of corrections, morgue, school, post office, and immigration department; and a check with an old boyfriend of the witness. *Id.* at 493. The district court granted federal habeas relief, holding that the state high court was unreasonable in concluding that the prosecution had made a sufficient effort to secure the witness's presence at trial. *Id.* The Supreme Court reversed:

> As we observed in [*Ohio v.*] *Roberts*, when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, *see* 448 U.S., at 75, 100 S.Ct. 2531, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

*Id.* at 495.

Villaverde argues that the situation in his case resembles that in *Motes* and that the State negligently released Gamboa from custody in December 2003 (dkt. no. 29 at 7-11). Villaverde seized on one sentence in the state investigator's memo regarding his attempts to locate Gamboa. (*Id.* at 7-8.) Stahl states that Gamboa's case worker told him that Gamboa was arrested in December 2003 and that "for some reason" she was released, purportedly by someone from the district attorney's office. (*Id.*) Villaverde provides no other support whatsoever for his bare assertion that someone from the district attorney's office was somehow involved in Gamboa's release from custody on an unrelated charge. This Court has reviewed the state-court record, which indicates that Gamboa was arrested about December 5, 2003, for possession of a controlled substance. (Exh. 137.) Court minutes reflect that on December 9, 2003, Gamboa was released on her own recognizance, with a notation "defendant to stay out of trouble

11

1  defendant may have probation hold." (*Id.*) Apparently, Gamboa subsequently failed to
2  appear for two court dates, which led the court to issue a bench warrant for her arrest
3  on February 13, 2004.  (*Id.*)

4        Villaverde presents a laundry list of other avenues that he argues the State
5  should have pursued in order to locate Gamboa and secure her presence at trial (dkt.
6  no. 29 at 10). The Court notes that the State did in fact take at least one of the
7  suggested actions (attempting to speak to friends and associates). Moreover, as the
8  Supreme Court has repeatedly emphasized, in hindsight it is always possible to identify
9  other steps that might have been taken to secure a witness's presence at trial.
10 Villaverde has failed to demonstrate that the Nevada Supreme Court's disposition of
11 federal ground 1 is contrary to, or involves an unreasonable application of, clearly
12 established federal law, as determined by the U.S. Supreme Court, or was based on an
13 unreasonable determination of the facts in light of the evidence presented in the state
14 court proceeding.  28 U.S.C. § 2254(d).  Accordingly, federal habeas relief is denied as
15 to ground 1.

### B.     Ground 2

Villaverde contends that trial counsel violated his Fifth and Sixth Amendment rights to effective assistance of counsel when he conceded in his opening statement that Villaverde participated in a conspiracy (dkt. no. 29 at 21-25).

Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim

13

on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 231, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

In his opening statements, Villaverde's counsel said that "the conspiracy theory that ties Mr. Villaverde in this case . . . just don't [sic] hold water." (Exh. 66 (dkt. no. 23-16 at 24-57) at 48.) Counsel stated that there can be a conspiracy to procure a place in order to have a drug deal, and he stated that Villaverde and Gamboa rented the motel room. (*Id.* at 49.) He argued that Villaverde was not at the motel when the robbery and murder occurred but that he returned to the room only to get the money that he was supposed to have earned for renting the room. Counsel urged that a person involved in a robbery or murder would be unlikely to walk by a motel employee and tell her that he was going to room 10. (*Id.* at 49-50.) He argued that there was no evidence that

///

///

///

14

Villaverde actually knew of a robbery or murder plan or participated in either. (*Id*. at 50-56.) He stated:

> there is nothing — nothing but gossamer strands that try to hold this conspiracy together that the State has indicated. And while [Villaverde and Gamboa] were involved in getting that room for a drug deal, they did not plan, participate within or commit a murder and cannot be found guilty for that.

*Id.* at 55-56.

In closing, counsel for Villaverde pointed out that there was trial testimony that Gato, Castro, and another man — but not Villaverde — had approached the victim's friend, Leonel Garcia, about robbing and murdering the victim. (Exh. 73, pt. A, (dkt. no. 24-11 at 36-53) at 42.) He argued that there was no evidence that Villaverde was part of a robbery/murder plan. (*Id.* at 46; Exh. 73, pt. B (dkt. no. 24-12 at 1-19) at 2-3, 5, 15-16.)

In affirming the denial of Villaverde's state postconviction petition, the Nevada Supreme Court explained:

> Appellant claims that [trial counsel's admission during opening statements that appellant participated in a conspiracy to procure a hotel room for a drug transaction] caused the jury to believe that appellant had knowledge that the robbery was going to occur. Appellant fails to demonstrate that his trial counsel was deficient or that he was prejudiced. Trial counsel did not admit that appellant committed a crime for which he was charged. Rather it appears that trial counsel admitted to conduct that minimized appellant's role in the crime while explaining his presence at the motel. This was a strategic decision by trial counsel and does not violate our holding in *Jones v. State*, 110 Nev. 730, 877 P.2d 1052 (1994). Further, appellant has failed to demonstrate a reasonable probability of a different outcome at trial had his trial counsel not made the admission in the opening statement.

(Exh. 135 (dkt. no. 24-21 at 104-110) at 107.)

In *Jones v. State*, 877 P.2d 1052 (Nev. 1994), the Nevada Supreme Court determined counsel rendered ineffective assistance when counsel conceded guilt during closing arguments after the defendant had pleaded not guilty and had testified at trial that he did not commit the crime. *Jones*, 877 P.2d at 1056-1057.

As the state supreme court alluded, the situation in *Jones* is readily distinguishable from Villaverde's case. Defense counsel did not concede Villaverde's

15

guilt of any charged crime, and Villaverde did not testify. Villaverde has failed to overcome the strong presumption that his counsel's strategic decision fell within the wide range of reasonable professional assistance. *See Yarborough*, 540 U.S. at 5. He has failed to demonstrate that the Nevada Supreme Court's disposition of federal ground 2 is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, federal ground 2 is denied.

The petition, therefore, is denied in its entirety.

## IV. CERTIFICATE OF APPEALABILITY

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Villaverde's petition, the Court finds that none of those rulings meets the *Slack* standard. The Court therefore declines to issue a certificate of appealability for its resolution of any of Villaverde's claims.

///

## V. CONCLUSION

It is therefore ordered that the first-amended petition (dkt. no. 29) is denied in its entirety.

It is further ordered that a certificate of appealability is denied.

It is further ordered that the Clerk shall enter judgment accordingly and close this case.

DATED THIS 28th day of March 2016.

MIRANDA M. DU
UNITED STATES DISTRICT COURT